NOTICE

Decision filed 05/03/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 200399-U

NO. 5-20-0399

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 19-CF-156 |
| | ) | |
| LORENZO PATTON, | ) | Honorable |
| | ) | Allan F. Lolie, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment is affirmed where sufficient evidence was presented to find defendant guilty beyond a reasonable doubt, the trial court sufficiently inquired into the possible conflicts of interest, the denial of defendant's motion to exclude the detective from the courtroom was not an abuse of discretion, and the prosecutor's closing argument did not deprive defendant of a fair trial.

¶ 2    Defendant, Lorenzo Patton, directly appeals from the trial court's judgment of conviction. He argues that (1) the State failed to prove him guilty beyond a reasonable doubt of first degree murder; (2) the trial court failed to comply with its duty to investigate defense counsel's potential conflict of interest, appoint new counsel, or obtain knowing waiver of said conflict; (3) the trial court erred in allowing Sgt. Rizzo to remain in the courtroom at the State's counsel table during trial despite otherwise granting defendant's motion to exclude witnesses; and (4) the prosecutor's

1

misconduct during closing argument deprived him of a fair trial. For the following reasons, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4    On April 26, 2019, defendant was charged by grand jury indictment with first degree murder, in violation of section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2018)), following the death of Precious Jones on September 22, 2018. Six witnesses listed on the indictment included: Joe Rizzo, Alyssa Chapman, Leanna Williams, Daryl Jones, Jerlynn Gray, and Charita Lenox.

¶ 5    At his first appearance hearing, upon defendant's request for counsel, the court appointed Craig Griffin to represent defendant. Griffin immediately advised the court that he had already addressed a potential conflict with defendant stemming from the fact that Griffin was currently representing Precious's sister. He further explained that Precious's sister was not a named witness in this matter and therefore did not believe his representation of Precious's sister presented a conflict of interest. Griffin averred that he believed defendant understood that he also represented Precious's sister and was "okay" with it. The court asked defendant if counsel was correct, and defendant stated, "yes."

¶ 6    At defendant's arraignment hearing on May 7, 2019, Griffin stated it had since come to his attention that he was also appointed to represent Precious's brother, Sam Jones. Griffin had not yet met with Mr. Jones and advised the court that it was his understanding defendant had no objection to this representation. Griffin further stated, "If it in any way ever tied in, obviously that would create a different problem, but at this juncture I have no information to lead me to believe [Sam Jones] is involved in any way." The court inquired as to defendant's position on the issue

2

and defendant responded, "Your Honor, like I stated to him, with all due respect to the Court, I'm innocent of this. So[,] I have no issue with him representing anyone from her family. Period."

¶ 7    The case proceeded to trial on September 14, 2020. Before trial began, defense counsel moved to exclude witnesses. The State moved for an exception for Joe Rizzo, of the Centralia Police Department, who was the detective in charge of the investigation. The State argued that they wanted Sergeant Rizzo available to assist the State during the trial. The court inquired if the State wanted Sgt. Rizzo to sit at the State's table as the lead investigator on the case, and the State confirmed that it did. Defense counsel acknowledged that the court had discretion under the law but argued such exception was usually for cases that were overly convoluted or had many exhibits, which was not the case here. He therefore objected. The court granted the motion stating, "Sometimes having a lead agent on a case is more helpful than having a second attorney I've found in my experience. *** And it often serves to speed up things as opposed to prejudice anybody."

¶ 8    On September 15, 2020, after the court provided its opening jury instructions, defense counsel renewed the motion to exclude witnesses from the courtroom. The court removed all potential witnesses except the State's first witness and Sgt. Rizzo. Opening arguments were presented and the following evidence was provided.

¶ 9    Sergeant DeWayne Morris, a crime scene sergeant for the Illinois State Police, testified first. He investigated Precious Jones's death on September 22, 2018. At 5:30 a.m., he arrived at Precious's home at 444 Anderson, Centralia, Illinois, and took photographs of the scene that were admitted into evidence. He explained that the front door opened into the living room, which was where Precious's body was located. He identified a DVD player on the floor and a television stand, with no television. He further identified the gunshot wounds in the pictures and explained there was stippling, which meant the shooter was less than six feet from Precious. He also identified two

3

9-millimeter shell casings found in the living room. On cross-examination, Sgt. Morris stated there was no evidence of forced entry. He fingerprinted areas and objects in the house, but no usable prints were obtained. Sgt. Morris confirmed two phones, a tablet, a light switch, and internal doorknobs were not fingerprinted, and he was unsure if the DVD player was checked for prints. None of the areas in the home were checked for touch DNA.

¶ 10     Greg Dodson, the current chief of police for the Centralia Police Department, testified next. He stated that he responded to the report of a shooting at 444 Anderson in Centralia, Illinois, on September 22, 2018, at approximately 3:23 a.m. Upon his arrival, Cole Gentz and Precious's daughter, Zhanae, were outside the home and told him someone had been shot. Upon entry, he recognized the victim as Precious Jones. He checked for signs of life, but none were found. Accordingly, he canceled EMS and fire from responding to avoid crime scene contamination and sealed off the residence after he conducted a sweep of the house. During the sweep, he noticed a shell casing next to Precious's head and another towards her feet. He confirmed there were no signs of forced entry into the home.

¶ 11     Luke Buckett, Precious's neighbor, testified that he resided approximately 50 feet from Precious's home. He heard two gunshots between 1:15 a.m. and 1:30 a.m. on September 22, 2018. He looked out his window but did not see anything. He did not directly report the incident to the police, but when police arrived at his home around 6 a.m., he told them what he heard.

¶ 12     On cross-examination, Luke stated he was awakened by the shots, looked at his phone to determine the time, and looked outside but did not call the police. He was not surprised by gunshots in the middle of Centralia because "it's Centralia, man." He stated a gunshot was unusual in his neighborhood, although the neighborhood and Precious's house had a lot of suspicious traffic. He

did not think a minute passed between the two shots but was unsure of the actual duration between the shots.

¶ 13    Zhanae Jones, the daughter of Precious, resided in Precious's home. Zhanae stated that she and her mother lived there with Alyssa Chapman and Alyssa's twin babies. She stated that Alyssa was not at the residence that evening because she was in the Clinton County jail. Zhanae was home all day with her mother. She left to go to Cole Gentz's house around midnight. When she left, her mother, the babies, and Jerlynn Gray were at the house. The lights and television were on.

¶ 14    Zhanae and Cole rode bikes on their return to her mother's home around 3 a.m. She arrived first, so she walked into the house to ask her mom if Cole could come in. She did not notice the lights were off and went straight to the back. She thought her mother was in the bathroom because the bathroom light was on. Zhanae entered the bathroom and then continued into her mother's room, which was connected to the bathroom, but her mother was not there. She left the bedroom, entered the hallway, looked to the left, and saw a red splatter on the couch. One of the babies was on the couch and she looked down and saw her mother on the ground. She grabbed the babies and ran out of the house to tell Cole what she had seen. They took the babies across the street and called for police and an ambulance. They then returned to her mother's house and waited outside for the police. She stated that she noticed the television was gone, but the DVD player and the tower speakers that were connected to the television were not taken.

¶ 15    Zhanae testified that her mother had a habit of locking the doors but would not lock them if her mother knew she was outside smoking or was on her way home. Sometimes her mother would lock the door while watching television but not all the time. Zhanae stated that her mother was not scared so she would not need to lock the doors. She agreed her mother would not let people into the house if she did not know them.

¶ 16    On cross-examination, Zhanae stated that her mother knew she would be returning later that night. She further clarified that she grabbed the babies on her way out and then sought Cole.

¶ 17    Cole Gentz testified that Zhanae was his best friend, and Precious was like a mother to him. His testimony confirmed that Zhanae got to her mother's house first. As Cole continued to approach Precious's home, Zhanae ran back down the street screaming, crying, and saying her mother was dead. Cole dropped the bike and ran back with Zhanae to the house. He saw the babies, one on the couch and one in the bassinet, and Precious lying on the ground. He ran through the house to make sure nobody was there, and then they grabbed the babies and took them to a friend about three blocks down the street. They then returned to the house to wait for the police. Cole confirmed the television was in the house a week earlier when he was present. On cross-examination, he confirmed that he went into the house with Zhanae to get the babies after she had already been in the house.

¶ 18    Dathan Orrill was the store manager at Rent One in Centralia. He identified a rental agreement between Rent One and Tina Bailey, dated July 20, 2018. The agreement covered a television and an entertainment center. He stated the agreement also included the serial number for the television which was 8RMAQ1Z816. Tina Bailey signed the agreement as Tina Burner. The Rent One agreement was admitted as Exhibit #1 without objection.

¶ 19    Amber Timmons testified that she was at Leanne Williams's house in Centralia during the early morning hours of September 22, 2018. Stacy Pace was also with her at that time but was now deceased. Amber and Stacy went to Leanne's home to visit and do laundry. When Amber arrived around 8 p.m. on September 21, 2018, Leanne, defendant, and Leanne's children were present. When Amber and Stacy were about ready to leave, around 10:30 or 11 p.m., defendant asked to borrow Amber's car to run to Lincoln Liquors, which was about four blocks away. She did not

expect him to be gone for long. She and Stacy continued to visit Leanne, but Amber eventually fell asleep on the couch. Stacy later woke her up when defendant returned to the house and brought the car back. Amber believed it was around 1:30 or 2 a.m. Defendant stated he was gone so long because he "got hung up." When Amber and Stacy went out to the car, they could not open the passenger door because the right front side of the car was smashed. Amber stated the car was not in that condition when it was loaned to defendant.

¶ 20     On cross-examination, Amber stated she was on probation for forgery that occurred in early 2019. She stated she was not promised anything in exchange for her testimony. She admitted she was a drug user "for a short while" back then. She admitted being under the influence on September 21, 2018, stating she had used heroin before she and Stacy went to Leanne's house. On re-direct, Amber stated that Stacy obtained the heroin in Centralia. She stated that she had prior dealings with defendant. She denied purchasing heroin from him but stated they previously got meth from him.

¶ 21     Leanne Williams testified that defendant was living at her house in Centralia on September 21, 2018. Stacy and Amber came to visit. Leanne's children were also there. After Stacy and Amber arrived, defendant called and asked if he could borrow their car. He came to the house around 1:30 a.m., borrowed the car, and stated he would not be gone long. She remembered being awakened at 2:23 a.m. to defendant kicking the bed, holding a television, and saying they shot "P," which was Precious's nickname. Leanne reviewed Exhibit #5 and stated Exhibit #5 resembled the television that defendant had with him when he returned to her house. She stated that she saw defendant put the television in her son's room and did not see it again until defendant loaded it into Daryl Jones's car about the time it was getting to be daylight.

7

¶ 22    On cross-examination, Leanne denied telling Sgt. Rizzo that defendant returned at 3:23 a.m., instead of 2:23 a.m. Leanne admitted to being a drug addict at the time but denied using that evening because she was in bed with her kids. While she acknowledged Amber and Stacy were at her house, she disputed hanging out with them. Leanne stated she only knew Amber and Stacy through defendant. Leanne averred that she thought Exhibit #5 looked similar to the television defendant brought to her house due to its size and confirmed she did not look at the television closely or touch it. After counsel noted Leanne's orange attire, she confirmed she had a pending charge in Clinton County for possession of a controlled substance. She stated that was her first charge there. Upon further inquiry, Leanne admitted that she also had a prior conviction for felony theft in 2009 and retail theft in 2018. She stated that no one promised her anything in relation to this case. On re-direct, Leanne stated she was not hanging out with Stacy and Amber. She allowed them into her home to wait for defendant to return their car while she was in bed with her kids.

¶ 23    Alyssa Chapman testified that she shared a home with Precious. She confirmed that she and her three children, as well as Precious and Precious's daughter, lived in the house, but only two of her three children were present on September 22, 2018. Alyssa stated she was in the Clinton County jail due to a traffic ticket and had been there for about 24 hours. She averred the living room had a television. She identified one of the photographs as her living room and pointed to where the television should have been. She stated the television was there when she went to jail and when she got home, Precious and her television were gone. Alyssa reviewed Exhibit #5 and stated it looked like her television. She stated that she purchased the television from a neighbor across the street named Tina Burner (Bailey). Only after the murder did she discover the television she bought from Tina was rented to Tina at Rent One. Alyssa testified she told police of this discovery.

8

¶ 24    Alyssa stated that Precious always locked the doors to her house except when she was going out to smoke or something. Alyssa worked nights and would not be home until four, five, or six in the morning. Even though she called beforehand, Precious would always have the doors locked. Alyssa did not notice any damage to the doors of the house when she was released from jail. She admitted knowing defendant and that Precious also knew defendant for about a month, stating they both bought heroin from him. Alyssa testified that Precious would have let defendant in the house.

¶ 25    On cross-examination, Alyssa stated that she worked nights at a gentleman's club in the Metro East area. She confirmed that she was in jail on the night of the incident and was subsequently transferred to Washington County a day or so later. She agreed that Detectives Rizzo and Dukes spoke with her on September 24, 2018, while she was in the Washington County jail. She also agreed they were in a recorded room and that she informed the detectives that she believed the television was "hot." She did not know if she told them the television belonged to Jim Allison because "[i]t was two years [ago]. I was coming off drugs, so I don't know." She did not recall saying it but admitted she could have said that. She also did not recall telling the detectives that it was a 55-inch Samsung television or confidently asserting it was a Samsung television to the detectives. She knew it was a smart television because that was why she bought it.

¶ 26    Daryl Jones stated that he learned of Precious's death on September 22, 2018, while he was driving back to Centralia after a trip to St. Louis. Daryl initially denied having contact with defendant after Precious's death but then remembered he had spoken to defendant about a television. Daryl ran into defendant that evening and talked about a television that defendant was selling. Daryl bought the television, picked it up from Leanne's house, and took it home. He averred that defendant went into Leanne's house, came back with the television, and they put it in

9

the car. Daryl paid defendant and then left. The State showed Daryl Exhibit #5 and asked if he recognized the television, Daryl stated, "I guess. I don't know." He agreed that it appeared to be similar to the one he purchased from defendant in regard to the size and the fact that it was a smart television.

¶ 27    Daryl later became concerned about the television he purchased when a friend called him, asked if defendant sold him the television, and told him the television could belong to someone who was deceased. Daryl then contacted Precious Jones's family and took the television to their house, where Zhanae, Precious's sister, Gorgeous, and a couple of other guys were waiting. Gorgeous and Zhanae looked at the television. Daryl told them he purchased it from defendant and left it with the family.

¶ 28    On cross-examination, Daryl agreed that he provided testimony for the grand jury and, at that time, stated he thought he was in St. Louis Saturday night and returned on Sunday. He also agreed that he currently had a felony for an aggravated fleeing charge in Marion County. He denied the State promised him anything in relation to his testimony at the current hearing. He also admitted he had a prior 2016 retail theft charge.

¶ 29    Lieutenant Jamie James of the Centralia Police Department testified that he was on duty on September 26, 2018, when he was called to a location in Centralia about a television taken to that location that may have come from Precious's home. Upon his arrival, he saw the television and spoke with Zhanae Jones, Precious's daughter, who told the officer that this was the television he was supposed to pick up. She did not indicate who brought the television to the house. Lt. James took possession of the television and placed it into evidence. Upon review of Exhibit #5, Sgt. James confirmed the exhibit was the television he took from Zhanae based on the evidence tags located on the television.

¶ 30    Patrol Sergeant Joe Rizzo testified that he was the detective in charge of the investigation into Precious Jones's death. He stated that, on September 26, 2018, Lt. James received a television after the murder was discovered and Exhibit #5 was the television Lt. James received. Sgt. Rizzo stated he was looking for the serial number because it was likely the television reported stolen from Tina Burner (Bailey). He did not find any stickers with the serial number; however, he recalled seeing a remote control in Alyssa's house and asked if they could have it to see if it would turn the television on and navigate the menu to find the serial number. He was able to get the remote to work on the television and was able to pull up the serial number. The State was granted permission to allow Sgt. Rizzo to demonstrate how he found the evidence to the jury.

¶ 31    After a short break, the court announced that the parties stipulated that the television classified as Exhibit #5 bore the same serial number as the television listed in the Rent One rental agreement entered into by Tina Burner (Bailey), Exhibit #1. The State moved to put Exhibit #5 into evidence and the defense objected claiming insufficient identity as the television taken from Precious's residence. The State responded that said identification was provided by Alyssa's testimony. The court overruled the objection and admitted Exhibit #5, stating the ruling was also based on the officer's testimony that he retrieved the remote for Exhibit #5 from Alyssa's home.

¶ 32    On cross-examination, Sgt. Rizzo agreed that the remote in question was a universal remote, and theoretically, a code for a universal remote would work on more than one television. On re-direct, Sgt. Rizzo testified that the serial number for the television was unique to each television. On re-cross, Sgt. Rizzo agreed that the serial number was for the television, not the remote.

¶ 33    Dr. Shiping Bao, board certified in anatomical, clinical, and forensic pathology, testified next. He identified the autopsy photographs and the toxicology report, taken as part of the autopsy

he performed on September 24, 2018. He stated the external exam revealed an entrance gunshot wound on the right upper back close to the shoulder and another on the right chest. The latter wound had stippling, indicating the gun was between two inches to one foot away from Precious when fired. That bullet related to the latter wound came out in the upper chest and then re-entered into Precious's neck perforating the larynx, trachea, and left common carotid artery. The physician explained that the left common carotid artery supplied blood to the brain and Precious's death was caused by drowning to death in her own blood. Dr. Bao found the cause of death was gunshot wounds of the chest, neck, and back. The toxicology reports indicated analytes and fentanyl in Precious's system, which did not impact his opinion as to Precious's cause of death. Thereafter, the court advised the jury that the parties stipulated that the cause of death was by gunshot wound that severed the carotid artery.

¶ 34    Detective Michael Johnson worked in computer forensics at the Mattoon Police Department. He testified that Charita Lenox signed a consent for him to search her iPhone on March 6, 2019. Using the Cellebrite program, Det. Johnson was able to retrieve the text messages between Charita and defendant from May 12, 2018, to December 21, 2018. The text messages were admitted as People's Exhibit 4. On cross-examination, defense counsel submitted the master extraction report as Defendant's Exhibit 1 and the flash drive that contained the report as Defendant's Exhibit 2.

¶ 35    Sgt. Rizzo was recalled by the State and testified that police received a call regarding the murder at 3:23 a.m. on September 22, 2018. Sgt. Rizzo stated the police report was locked so that only people with certain user rights could see the report, and the report was not released to the public. He testified there were details in the report that were not released to the media, including that Precious was shot twice, Alyssa's occupation, and that two babies were found in the home.

12

¶ 36    On cross-examination, Sgt. Rizzo agreed that Alyssa's occupation was likely known in the neighborhood. He further agreed there was a way the public could know that two babies were present because Zhanae and Cole took the babies to another person after discovering Precious. He stated the public did not know about the two shots because even Zhanae did not know. Only the people with access to the report and the pathologist knew there were two shots. Sgt. Rizzo admitted he did not watch the video between Detective Dukes and Chris Carroll, taken approximately three days after the murder, at which time Detective Dukes allegedly told Chris that Precious was shot twice. He stated that information was not included in the narrative report.

¶ 37    Charita Lenox next testified, stating that she and the defendant sold heroin together. Defendant also lived with her and her boyfriend for about six months prior to defendant moving to Centralia in May or June 2018. She received a text message from him around September 21, 2018, asking her to give him money because his girlfriend, Sharica, stole his stuff. She sent him money and also provided him with a train ticket to Charleston, Illinois. Defendant arrived in Charleston on September 23, 2018, texted her, and they arranged to meet later that night at her house. When they met, they talked about why he needed the money, the business that they planned to do, and then defendant told Charita about the incident that happened in Centralia. Charita testified that incident involved a woman called P that defendant claimed set him up to be robbed so he went to her house, and she answered and asked him if he was hungry. He said he wasn't hungry, they had a conversation, and then he went to use the bathroom. Charita testified that defendant told her:

> "When he came out of the bathroom he said he basically looked around the house
> to see if anybody was there. And he said when he came—when he found out nobody
> was there besides the babies, she was baby-sitting some babies or something

13

because her roommate was a stripper. And that when he came into the front room she turned around and she had just finished changing one of the bab[ies], he said, and he shot her. And then he said when she went down[,] he shot her again. And then she was like ahh, and he knew she was dead[,] and he left."

Charita stated defendant told her this on September 23, 2018. She admitted that she did not come forward with the information until about six months later. She was still doing business with defendant and was under the impression that she was the only person that knew what happened. She was afraid to risk her own safety, knowing what type of person she was dealing with. Charita admitted that she was also facing charges in Coles County for possession and manufacturing with intent to deliver. She stated that no deal was made with the Coles County prosecutor for her to testify in this case. She averred that she was testifying because defendant needed to pay for what he did because "[y]ou can't just do people like that." She also admitted having a falling out with defendant after he took her money and drugs and did not pay her what she was owed. She stated that defendant's contact information in her iPhone was labeled "Zo." She identified the text messages retrieved from her phone between defendant and her from May 12, 2018, to December 21, 2018, including the September 23, 2018, message from defendant upon his arrival in Charleston, Illinois.

¶ 38    On cross-examination, Charita stated that she testified before the grand jury and stated that she was being investigated for a drug-induced homicide when she initially talked to the Mattoon police officers. She was ultimately charged with delivery of a controlled substance related to that incident. She admitted she had a prior conviction in 2010 for possession of a controlled substance. She also admitted that she indicated during the grand jury proceeding that the officers stated that if she had information on this case and gave it to them, it would help her own case. Charita agreed

14

that she initially told the police she did not know how defendant arrived at her house upon arriving in Charleston. She later admitted that her text messages showed defendant asked her to pick him up once he got to town. She also conceded that defendant first messaged her about sending him money on September 19, 2018. She admitted lying to police in telling them that she had little contact with defendant after her mother told her to stay away from him, and she actually continued to deal drugs with defendant. Charita admitted reviewing the video from her interview recently. She did not recall telling the Mattoon police that she never dealt drugs and that it was her boyfriend Moochie who dealt drugs with defendant. She further indicated in one of her interviews that a girl named Bubbles called defendant's friends from Chicago and said that the Centralia police were looking for him. Charita admitted she did not tell the police that she and defendant were dealing drugs together or that they had a falling out because he took her money and drugs. Charita also admitted refusing to speak with defendant's private investigator. On re-direct, Charita stated that she consistently stated defendant admitted to her that he shot Precious Jones. She further indicated that she consistently stated that one shot was closer than the other.

¶ 39    Thereafter, the State rested. Defense counsel moved for a directed verdict and argued the evidence was insufficient as a matter of law due to the lack of evidence that Tina's television was the exact television at Precious's house, the lack of DNA, no witnesses, or fingerprints. After hearing the State's response, the court denied the motion.

¶ 40    The defense first called Sgt. Rizzo to testify. Sgt. Rizzo confirmed that he previously testified that he interviewed Leanne Williams, and she indicated that defendant came into her room at 3:23 a.m. He further testified that he interviewed Alyssa Chapman who indicated the television was a 55-inch television and believed it was a Samsung.

15

¶ 41     On cross-examination, Sgt. Rizzo agreed that Leanne was pretty adamant that defendant came into her room at 2:23 a.m. during her trial testimony. Sgt. Rizzo stated the change in time could have been his mistake because the original interview was unrecorded, and he had nothing to take notes. He was going from memory. On re-direct, Sgt. Rizzo stated that he always tried to be as accurate as possible. He agreed that he was usually right when he put down times or would leave it blank if he was unsure. When he did write down a time, it was based on his recollection. On re-cross, Sgt. Rizzo agreed that 3:23 was also the same time that the call came in regarding the case.

¶ 42     Detective Dukes testified that he interviewed Chris Carroll at the Marion County jail on September 25, 2018, as part of his investigation in this case. He identified the interview with Chris and the video was played for the jury. Detective Dukes explained that when he spoke with Chris, he was a potential suspect and said there was bad blood between him and Precious. During the interview, the detective shifted from thinking Chris was a suspect to thinking Chris could possibly help with the case. He told Chris that Precious was shot twice to play on Chris's emotions to get information. The detective stated that he did not tell anyone else that Precious was shot twice. The video was admitted as Defendant's Exhibit #4 with no objection.

¶ 43     The parties presented to chambers where defense counsel stated he intended to introduce alternate suspect evidence against Chris and would call him as a witness. The court admonished Chris of his fifth amendment rights against self-incrimination. The State confirmed that it was not seeking to prosecute Chris and stated it had no evidence that Chris committed the murder except hearsay statements of other people. Chris advised the court that he wished to waive his rights and testify at the trial.

¶ 44    Christopher Carroll testified that he was 28 years old and lived in Vandalia. He was currently on parole and stated he previously dated Zhanae Jones, the daughter of Precious, from the beginning of 2017 until her mother died. Chris admitted that Precious did not get along with him, and everybody knew that. He agreed that he was in the Marion County jail in September 2018 but was furloughed on September 20, 2018, the Thursday before Precious was murdered. He did not have to report back to the jail until the Monday after the murder. He did not recall having a conversation with Shawn Meredith prior to his release about Precious. He did not recall telling Shawn that Precious was a problem and that he thought she was working for the police. Chris also denied having a conversation with Andrew Sloat about Precious and further denied telling Andrew that he killed Precious or provided any details of the killing.

¶ 45    On cross-examination, Chris denied killing Precious. He stated that he and Precious would argue like he was her son, and if he had nowhere to go and was strung out, she would bring him into her house, even if his own mother would not. Chris testified that he had no reason to kill Precious.

¶ 46    Larry Woodward testified that he was 49 years old and lived in Salem, Illinois. He agreed he was in the Marion County jail in September 2018 and was in the same area as Chris. He overheard a conversation regarding Precious between Chris and Shawn. He heard Chris say that Precious was working for the police and needed to be taken care of. The statement was made prior to Chris being furloughed. On cross-examination, Larry admitted having prior convictions for possession of methamphetamine in 2019 and possession of a controlled substance in 2017. He confirmed that no details of the murder were provided; he only heard the statement that Precious should be taken care of.

¶ 47    Chris was recalled to the stand and admitted he was in jail because he was convicted of burglary in Marion County and Clinton County. He was given a furlough before going to Illinois Department of Corrections.

¶ 48    Andrew Sloat testified that he was 29 years old and lived in Salem, Illinois. He met Chris in prison, approximately four years earlier. He maintained contact with Chris since being released from prison. At some point, Andrew confronted Chris about ripping him off and during that confrontation, Precious's name came up. Chris threatened to do the same thing to Andrew that he had done to Precious. Andrew stated that Chris did not go into great detail but told Andrew that he and two others went to Precious's house and "a white bitch was walking out." Thereafter, Chris and his two friends went to the side of the house. The white woman left the door unlocked and he said Precious never saw it coming. Chris said they shot her in the back while in the living room. Andrew stated he did not report the information to anyone and confirmed he was on the same cell block as defendant. He told defendant that he did not believe defendant had committed the crime. Afterwards, defendant would not talk to him about the case but had tears in his eyes. Andrew is no longer in the same cell block as defendant, was not promised anything to testify, and never met defendant before being in the same cell block as him.

¶ 49    On cross-examination, Andrew stated he was initially in the same cell block as the defendant for 10 or 11 days but was moved four days ago. He admitted having prior convictions for criminal trespass to a residence and violation of an order of protection in 2015. He was also convicted of domestic battery in 2015, felony theft in 2017, and was currently in jail because he missed court for his pending charge of possession of a controlled substance. On re-direct, Andrew confirmed that he was not receiving any credit for testifying in this case and had nothing to gain by testifying.

18

¶ 50    Sgt. Rizzo was recalled to the stand and testified that he was familiar with Jerlynn Gray and confirmed she was a white female. Thereafter, the videos from Charita's interviews were played to the jury.

¶ 51    Following a short break, defendant testified that he had a 2019 aggravated battery conviction from Coles County. He admitted being in Centralia on September 21, 2018, and came into contact with Stacy Pace and Amber Timmons at Leanne Williams's residence. He asked Stacy and Amber if they would go to the liquor store around 10:30 or 11 p.m. They did and returned thereafter. After they returned, defendant received a call from Sharica O'Neal, his ex-girlfriend, asking if he would pick her up. He asked Stacy and Amber if he could rent their vehicle in exchange for heroin. He would usually give them a "tenth" then use the vehicle for a few hours. They agreed and he went to pick up Sharica. After he picked up Sharica, she received a telephone call from her best friend, Jerlynn Gray, and Sharica asked defendant to take her to her sister, Shawna Jackson's, house where Jerlynn was at the time. Defendant took Sharica to Shawna's house. He spoke with Jerlynn for a few minutes and told Sharica he needed to go sell someone drugs as an excuse to leave. Defendant testified that he did not leave to sell drugs but instead met up with Camille Darden with whom he was having an affair. He met Camille in the Lincoln Liquors parking lot, and she followed defendant to Dorian Bennett's house. Camille parked her car behind Dorian's garage and jumped into defendant's vehicle. After she gave defendant oral sex, defendant drove to the front of Dorian's house. Defendant got out and Camille stayed in the vehicle. Defendant talked to Dorian for about 30 to 45 minutes. He then left because Dorian's wife was friends with Sharica, and he did not want Dorian's wife to come out of the house and see Camille and tell Sharica.

¶ 52    Defendant returned to Shawna's house and told Sharica that he was "going to go back top" which was code for "recoup some heroin." Sharica gave defendant $9000 for 200 grams of heroin.

19

He then kissed her and left. Defendant testified that he had been drinking that night, and when he left Shawna's house, he turned too close to a garbage dumpster and wrecked the right side of the vehicle that Amber and Stacy let him borrow. He picked up Camille, who then drove the vehicle because defendant was too drunk. He stated that he had to climb in through the back passenger door because the front passenger door was jammed. Camille drove the vehicle back to Leanne's house. Camille got out and went to the back of the house; defendant went to the front door. He walked through the house to the back door, let Camille in, and took her to Leanne's son's bedroom. Defendant averred that Leanne's son was not in the bedroom and that he rented that room in exchange for heroin. He was in the room with Camille when Leanne knocked on the door, yelling about the damage to Amber and Stacy's car. Defendant hid Camille in the hallway and went outside to look at the car with Leanne, Stacy, and Amber. He gave $150 to Stacy and Amber to make amends. Defendant also gave Leanne $40 for bringing "all of this" to her house. He then returned to the room with Camille and stayed there for the rest of the evening.

¶ 53 Defendant testified that later that evening he received a text from "Shorty," which was the nickname for Donnie Hemmings. The text indicated that Shorty had a television for sale and defendant responded to Shorty by telling him that he would take the television as payment for Shorty's debt. Shorty asked him if he had heroin and defendant told him he did not. Defendant stated that he gave Shorty $40 cash to keep Shorty from selling the television somewhere else and agreed to forgive Shorty's debt for the television. Defendant obtained the television in the early hours of September 22, 2018, and sold the television to Daryl Jones later that day. Defendant stated the television was a flat screen, nice size with a bracket on the back that came down into an oval-shaped stand.

¶ 54     Defendant testified that he paid Amber and Stacy to drive him to Charleston, Illinois, on September 23, 2018. Defendant disputed telling Charita that he killed Precious. He stated he would not have killed Precious because she was his friend. He agreed that he and Charita decided to go into business together selling drugs. He further agreed that he ripped off Charita, took her heroin clientele, and never tried to even things out with her.

¶ 55     On cross-examination, defendant denied getting to Leanne's house at 2 or 2:30 a.m. He stated that he and Camille arrived between 1 and 1:30 a.m. He believed he got the television approximately 15 minutes after he got to Leanne's house. Defendant let Shorty in the back door so no one would see him, and Shorty placed the television on the steps just inside the door. Defendant testified he did not leave the house until hours later. He disputed walking into Leanne's bedroom with the television. He disputed the testimony to the contrary, stating those witnesses "clearly lied." The defense rested.

¶ 56     Closing arguments were provided the following day on September 17, 2020. During defense counsel's closing argument, counsel asked "Where is Jerlynn? The State talks about this being some sort of investigation and we haven't heard from the last person who might have possibly seen Precious alive." During the State's rebuttal argument, the State argued,

> "They talk about Jerlynn Gray not being here. What's Mr. Griffin think[ing], that I can just command people to be here? I got to find them. I got to subpoena them. Every person that testified was subpoenaed. Half of them didn't want to be here, and I think you could tell that probably from the way some of them were testifying. We went out and we got every witness we could. But when you have a witness who is hiding and ducking, you can't get them here. Sorry. I

21

anticipate Jerlynn Gray would have said, yeah, I was there, I visited for a while and I left."

¶ 57    Defense counsel objected and the court sustained the objection, stating there was no evidence of that. After an outburst from defendant which resulted in his removal from the courtroom, the court clarified, "The objection made by Mr. Griffin was sustained. The attorneys are not allowed to speculate as to what a witness would have said if he or she would have been placed on the stand."

¶ 58    During the rebuttal argument, the State also argued, "We heard [Charita] testify several times yesterday. I neglected to tell you she also testified under oath in front of a grand jury. Consistent statements all along." Defense counsel objected. The State withdrew the statement, but the court still sustained the objection, stating, "There was no evidence about any grand jury testimony, at least what the contents were. So the jury should disregard that comment." The State also argued,

> "What about Chris Carroll? He cooperated with the police, he gave a statement, you saw part of it. And he testified, and since he testified we didn't show you the video. But that video was given to Mr. Griffin which we're required to. In fact, every video we had of a witness had to be given to Mr. Griffin. Why? That's just the way it is. We didn't know what the defendant was going to say or even if he was going to testify. But we gave them everything that we had so they could be prepared."

¶ 59    The State also declared, during its initial closing argument, "[Precious] took care of people, she was a good person. Was she an addict? Yes, she was. But was she a good person? Yes." No objection was raised. During rebuttal, the State further declared, "Ladies and gentlemen, there

22

needs to be justice for Precious, this was her life too." Defense counsel objected but the objection was overruled.

¶ 60    Following deliberations, the jury reached its verdict and found defendant guilty of first degree murder. Each juror was polled and affirmed their verdict. On September 25, 2020, defense counsel filed a motion for judgment notwithstanding the verdict, or in the alternative, a new trial. The motion alleged, *inter alia*, that (1) the State failed to prove defendant guilty beyond a reasonable doubt, (2) the court erred in denying defense counsel's motion for a directed verdict at the close of the State's case, (3) the court erred in admitting the television into evidence because no one positively identified it as being the television from the deceased's residence, (4) the State improperly tried to shift the burden of proof to defense with its rebuttal argument when defendant had no obligation to produce evidence, (5) the State improperly called defendant's arguments a "red herring" during rebuttal which improperly prejudiced the jury, and (6) the State, during rebuttal argument, improperly tried to evoke sympathy of the jury by referring to Precious as a nice or kind person which was character testimony that improperly prejudiced the jury.

¶ 61    The court denied defendant's posttrial motion. Following a sentencing hearing, the court sentenced defendant to natural life imprisonment. Defendant timely appealed.

¶ 62                                    II. ANALYSIS

¶ 63    On appeal, defendant argues that (1) the State failed to prove his guilt beyond a reasonable doubt for first degree murder, (2) the court erred in failing to address his attorney's potential conflict of interest and defendant's waiver of such conflict was unknowing, (3) the court erred in allowing Sgt. Rizzo to sit at the State's counsel table, and (4) the State's closing argument was prejudicial to the defendant. We address each argument in turn.

23

¶ 64                    A. Sufficiency of the Evidence

¶ 65    In claiming the State failed to prove his guilt beyond a reasonable doubt, defendant contends the State's case hinged on connecting defendant to the television taken from Precious's house and Charita's testimony. He argues neither support a conviction of first degree murder. Beyond the infirmities in the State's case, defendant argues he presented credible evidence that Chris Carroll was the perpetrator.

¶ 66    Due process requires the State to prove each element of an offense beyond a reasonable doubt. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing the sufficiency of the evidence, it is not our function to retry defendant or substitute our judgment for that of the trier of fact. *People v. McLaurin*, 2020 IL 124563, ¶ 22. Rather, we must determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 11. "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 67    Under this standard, circumstantial evidence can be sufficient to sustain a conviction. *Id.* Although not conclusive or binding on this court, we give great deference to the trier of fact's determinations regarding the weight afforded to the evidence and witness credibility. *People v. Gray*, 2017 IL 120958, ¶ 35. We also view the evidence, and all reasonable inferences thereof, in the light most favorable to the State. *People v. Vanhoose*, 2020 IL App (5th) 170247, ¶ 24.

¶ 68    Defendant first argues that State's evidence was insufficient where the only witness— Charita—who testified that defendant killed Precious was not credible. He claims that Charita had motive to falsely accuse defendant and was dishonest with police regarding when defendant first

24

texted her for money to return to Charleston and whether she picked defendant up once he arrived in Charleston. "A conviction will not be reversed simply because *** the defendant claims that a witness was not credible." *Gray*, 2017 IL 120958, ¶ 36. Defense counsel raised the same issues of Charita's credibility to the jury. "[I]t is for the jury to weigh the credibility of the witnesses and to resolve conflicts or inconsistencies in their testimony." *People v. Frieberg*, 147 Ill. 2d 326, 360 (1992).

¶ 69    Regarding the defendant's assertion that Exhibit #5 was not evidence of his guilt, defendant argues no one identified People's Exhibit #5 as the television that was in Precious's home. Defendant contends that the chain of possession did not establish Exhibit #5 came from Precious's home where Zhanae did not say where she got the television from, and Daryl could not positively identify Exhibit #5 as the television he brought Precious's family. He moreover asserts the testimony of Alyssa—who actually purchased the television—raised a reasonable doubt that Exhibit #5 was the television from Precious's home where Alyssa stated that she bought the television from Tina but admitted she believed the television was stolen from "big Jim Allison," and Alyssa was unsure whether the television she bought was a 55-inch Samsung television. We disagree.

¶ 70    We clarify that—unlike at trial—defendant does not argue on appeal that Exhibit #5 should not have been admitted based on lack of foundation. Rather, he contends "this critical piece of evidence in the State's case does nothing to prove [defendant] was the person who shot and killed Precious." We therefore only consider Exhibit #5 in the context of his sufficiency argument. See *People v. Ofoma*, 242 Ill. App. 3d 697, 706-07 (1993) (acknowledging a chain of custody argument differs from a sufficiency argument when the chain of custody dispute does not impact an element of the offense charged).

25

¶ 71   Defendant's argument, that Exhibit #5 provides no support for the State's case when no witness positively identified Exhibit #5 as the television that was in Precious's home prior to her murder, is without merit. " 'The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' " *People v. Jackson*, 232 Ill. 2d 246, 281 (2009) (quoting *People v. Hall*, 194 Ill. 2d 305, 330 (2000)). While several inferences are required to make the connection that the television stolen from Precious's home was that same television as defendant sold to Daryl, we find the circumstantial evidence sufficient for a reasonable person to conclude the television was the same.

¶ 72   The evidence here showed that Tina rented a television from Rent One. Alyssa bought a television from Tina and put it in Precious's home, where she lived. According to Alyssa and Zhanae, the television Alyssa bought was in the living room of Precious's home before the murder. The television was gone when Precious was discovered deceased. Either about an hour before, or about the same time as, the police were informed of the murder, defendant brought a television into Leanne's bedroom and told her Precious was shot. Sometime later that day, defendant sold the television he had to Daryl. After being alerted the television may have belonged to someone who is now deceased, Daryl took the television he bought from defendant to Precious's family, including Zhanae. Zhanae then gave police a television that she believed may have come from her mother's home.

¶ 73   Importantly, the television Zhanae gave to the police had the same unique serial number as the television Tina rented from Rent One. Despite any previous belief of Alyssa that the television she bought from Tina was stolen from Jim Allison or prior statement that she bought a 55-inch Samsung television from Tina, Alyssa testified that Exhibit #5 looked like the television she

26

bought from Tina. She also stated that she discovered the television she bought from Tina actually came from Rent One and informed police of this discovery.

¶ 74     Any doubt arising from Daryl's failure to positively identify Exhibit #5 as the same television that defendant sold to him or the lack of testimony from Zhanae specifying where she obtained the television that police labeled as Exhibit #5 certainly goes to the weight of the evidence. See *People v. Taylor*, 2011 IL 110067, ¶ 41 ("[G]aps in the chain of custody go to the weight of the evidence, not its admissibility."). It is a jury's responsibility to weigh the evidence and draw reasonable inferences therefrom. *People v. Washington*, 2012 IL 110283, ¶ 60. Here, Leanne testified that Exhibit #5 resembled the television that she observed defendant sell to Daryl and Daryl testified that Exhibit #5 was the same as the television he bought from defendant in size and the fact it was a smart television. Zhanae also gave police the television labeled as Exhibit #5 for the same reason Daryl took her the television that he bought from defendant, *i.e.*, the television potentially came from Precious's house.[1] Based on this evidence, we find a jury could reasonably infer that the television stolen from Precious's home was the same as that Daryl bought from defendant and Zhanae gave to police.

¶ 75     Thus, a reasonable jury could have concluded that defendant was in possession of the television stolen from Precious's home and informed Leanne of the shooting shortly after it occurred. The jury could have also relied on Charita's testimony that defendant admitted to committing the murder to her. While defendant presented evidence that Chris Carroll murdered

---

[1]We note that defendant argues we should disregard, as hearsay, the testimony that Daryl was informed that the television he bought from defendant might be from a deceased person and that Lt. James was informed the television Zhanae gave to him possibly came from Precious's home. However, the court found the statements informing Daryl that the television he bought from defendant may belong to a deceased person did not assert the truth of the matter asserted, and defendant does not argue that finding was incorrect on appeal. Also, there was no objection during the trial, or argument asserted on appeal, challenging the testimony that Lt. James was informed of the same. Accordingly, any argument that this evidence should not be considered is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

27

Precious, the jury was not required to accept defendant's theory of the case. See *People v. Heflin*, 71 Ill. 2d 525, 533-34 (1978) ("[T]he jury was not compelled to accept the defendant's account of what happened at the time of the crime, but was permitted to consider the surrounding circumstances and the probability or improbability of the defendant's story."). "The trier of fact is in a position to evaluate the credibility of witnesses by their demeanor in court. It is apparent that the jury resolved the credibility issues in this case in favor of the State's witnesses." *People v. Van Kampen*, 147 Ill. App. 3d 181, 186 (1986). We defer to the jury's judgment (see *People v. Moss*, 205 Ill. 2d 139, 165 (2001)) and find the evidence was sufficient to support defendant's conviction of first degree murder.

¶ 76                                  B. Conflict of Interest

¶ 77    Defendant next contends the court erred at his first two hearings where counsel informed the court that he represented Precious's sister and brother. Under the sixth amendment, defendant is entitled to effective assistance of counsel, which "includes the right to conflict-free representation." *People v. Green*, 2020 IL 125005, ¶ 20. This requires undivided loyalty from counsel and prohibits counsel from "representing conflicting interests or undertaking the discharge of inconsistent obligations." *People v. Washington*, 101 Ill. 2d 104, 110 (1984). Conflicts of interest fall into one of two categories: *per se* and actual. *People v. Green*, 2020 IL 125005, ¶ 20. Unless the defendant waives his right to conflict-free representation, a *per se* conflict requires automatic reversal. *People v. Yost*, 2021 IL 126187, ¶ 39. In contrast, an actual conflict of interest requires the defendant to identify "an actual conflict of interest that adversely affected his counsel's performance." *Id.* ¶ 38.

28

¶ 78    Defendant argues counsel presented a *per se* conflict of interest and the trial court failed to obtain a knowing and voluntary waiver of the conflict of interest. We disagree that any *per se* conflict of interest existed.

¶ 79    Illinois case law recognizes only three categories of *per se* conflict of interest: (1) counsel's contemporaneous association with the victim, prosecution, or any entity assisting the prosecution; (2) counsel's contemporaneous representation of a prosecution witness; and (3) counsel was a former prosecutor who was personally involved in a prior prosecution of the defendant. *Id.* ¶ 66. Defendant does not contend the alleged conflict here fits into any of three recognized *per se* categories, but nevertheless argues that counsel's contemporaneous representation of Precious's brother and sister was a *per se* conflict of interest because Precious's brother and sister would clearly benefit from defendant being found guilty of homicide of their sister. In support of his argument, defendant cites to *People v. Gacho*, 2012 IL App (1st) 091675, ¶ 32.

¶ 80    Despite defendant's contentions, *Gacho* does not support his argument. The defendant in *Gacho* alleged in his postconviction petition that his trial counsel labored under a conflict of interest where counsel represented a member of the victim's family at the same time as the defendant and admitted to discussing defendant's case with the victim's family. *Id.* ¶ 9. The circuit court dismissed defendant's petition after the second stage of the postconviction proceedings. *Id.* ¶ 15. The First District reversed, finding that the defendant's petition made a substantial showing of a constitutional violation that warranted a third-stage evidentiary hearing because counsel would be presumably motivated to maintain the family's favor, and "notwithstanding that point, the defendant directly alleged that counsel admitted having discussed his case with the [victim's] family." *Id.* ¶ 32. However, the court explicitly declined to decide whether counsel suffered from a *per se* conflict of interest. *Id.* In fact, in a subsequent appeal from the denial of *Gacho*'s

postconviction petition after a third-stage evidentiary hearing, the First District rejected such contention. *People v. Gacho*, 2016 IL App (1st) 133492, ¶ 33. As such, the *Gacho* appeal (*Gacho*, 2012 IL App (1st) 091675) after the dismissal at a second-stage postconviction proceedings provides no support for defendant's position, and the subsequent *Gacho* appeal (*Gacho*, 2016 IL App (1st) 133492) is contrary to defendant's position.

¶ 81　Defendant's argument that a *per se* conflict existed is based upon the justification for the *per se* conflict rule, which states a *per se* conflict arises when a defendant's attorney is connected to a person or entity that would benefit from an unfavorable verdict for the defendant. *People v. Fields*, 2012 IL 112438, ¶ 40. However, the Illinois Supreme Court has made clear that the justification for the *per se* rule does not provide a basis to expand the rule and find a fourth situation in which a *per se* conflict exists. *Id.* ¶¶ 40-41; *People v. Green*, 2020 IL 125005, ¶ 36. Because— as defendant admits—the alleged conflict does not fit within the three recognized categories of a *per se* conflict, no *per se* conflict exists here.

¶ 82　Alternatively, defendant contends that counsel raised an actual conflict of interest and argues that the trial court failed to complete its inquiry obligation triggered by counsel raising a possible conflict or obtain a knowing and voluntary waiver of the conflict of interest. When counsel raises a potential conflict of interest to the trial court's attention at an early stage of the proceedings, the trial court has a duty "to either appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel." *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988) (citing *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978)). "As part of the inquiry, the trial judge may also inquire if the defendant wishes to be represented by the attorney regardless of the conflict." *People v. Johnson*, 322 Ill. App. 3d 117, 123 (2001). However, "[t]he exact manner of the judge's inquiry is not prescribed." *Cerro v. United States*, 872 F.2d 780, 786

(7th Cir. 1989). If the trial court fails to complete its duties, defendant need not show specific prejudice by the purported conflict to obtain reversal. See *Spreitzer*, 123 Ill. 2d at 18.

¶ 83    Here, at defendant's first appearance, the court appointed Attorney Griffin to represent defendant. At that time, Griffin informed the court that he currently represented the named victim's sister and discussed the matter with defendant. It was Griffin's understanding that Precious's sister was not a named witness in the case, and he did not believe there was a conflict of interest. Griffin wanted to inform defendant and the court of that fact to avoid any appearance of impropriety. At the next court date, defendant's arraignment hearing, Griffin informed the court that he had been appointed to represent the named victim's brother, Sam Jones, but had not yet spoken to him. Griffin stated, "If it in any way ever tied in, obviously that would create a different problem, but at this juncture I have no information to lead me to believe he is involved in any way."

¶ 84    Under the circumstances of this case, we find the court did not need to probe further into counsel's representation of Precious's siblings. All that is required of the court is that it take "adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel." *Id.* Here, counsel provided the court with all the information he had regarding his representation of Precious's siblings. Counsel acknowledged that if the siblings were tied into this case, a problem may arise, but he had no information that either sibling was involved with this case and did not believe there was a conflict of interest. Because counsel's statements indicated he provided the court with all the information available regarding his representation of Precious's siblings, it was reasonable for the court to not ask any further questions and the record does not indicate that the court's failure "to delve deeper into the alleged conflict resulted in its lacking any material information." *United States v. Fish*, 34 F.3d 488, 493 (7th Cir. 1994). "Given defense counsel's duty to avoid conflicts of interest and to advise the court promptly upon discovery of a

conflict, the trial court's reliance on defense counsel's own assessment regarding the potential for conflict was entirely reasonable." *Id.*; see also *People v. Powers*, 260 Ill. App. 3d 163, 167 (1994) (citing *Holloway*, 435 U.S. at 486 n.9). "[A] conflict cannot be created on mere speculation" and the possibility that counsel's representation may, at some point, result in conflict is insufficient to establish a conflict. *People v. Cole*, 2017 IL 120997, ¶ 58. Accordingly, we find the court fulfilled its duty to adequately ascertain whether appointment of separate counsel was warranted. Because the record here supports the conclusion that the potential conflict did not warrant appointment of separate counsel, the court did not need to obtain a voluntary and knowing waiver of the potential conflict.

¶ 85                    C. Sgt. Rizzo's Presence at the State's Table

¶ 86    Defendant next contends Sgt. Rizzo's presence at the State's table constituted first-prong plain error. Alternatively, defendant argues that his trial counsel was ineffective for failing to include this argument in defendant's posttrial motion.

¶ 87    To preserve an error for review, the party must object at trial and present the issue in a posttrial motion. *People v. Nelson*, 235 Ill. 2d 386, 436 (2009). Here, counsel failed to assert the issue in the posttrial motion. A court, however, may excuse a party's forfeiture of an issue under plain error review if the evidence was closely balanced. *People v. Nieves*, 192 Ill. 2d 487, 502 (2000); see Ill. S. Ct. R. 615 (eff. Jan. 1, 1967). "The first step of plain-error review is determining whether any error occurred." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 88    In arguing the court did not err, the State contends that *People v. Mack*, 25 Ill. 2d 416, 422 (1962), is controlling and a motion to exclude a single officer from a rule on witnesses should not be rejected so long as the record discloses a sound basis for such denial. The State also cites to the numerous Illinois Supreme Court case law that held the trial court may use its discretion and allow

32

a police officer to remain in the courtroom. See *People v. Townsend*, 11 Ill. 2d 30, 47 (1957); see also *People v. Adams*, 41 Ill. 2d 98, 100-01 (1968); *People v. Scott*, 38 Ill. 2d 302, 306 (1967).

¶ 89    Defendant argues the State's authority was published before the enactment of Illinois Rule of Evidence 615 (eff. Jan. 1, 2011). Under the current Rule 615, the court is required to exclude all witnesses at the request of a party unless the person is—*inter alia*—"essential to the presentation of the party's cause." Ill. R. Evid. 615(3) (eff. Jan. 1, 2011). Defendant argues the State did not show—or even claim—Sgt. Rizzo's presence was essential to the presentation of the State's case. He, moreover, asserts the investigation was not highly complicated or technical such that the State needed the detective's assistance.

¶ 90    Despite defendant's contention that Rule 615 requires the court to exclude witnesses upon a party's request, the only cases we could find that cite Rule 615 maintain the abuse of discretion standard. *In re K.E.*, 2023 IL App (5th) 230076-U, ¶ 50; *People v. Chatman*, 2022 IL App (4th) 210716, ¶¶ 67-68; *Peak Exteriors, LLC v. Goebel*, 2021 IL App (2d) 200244-U, ¶ 34; *In re N.F.*, 2020 IL App (1st) 182427, ¶¶ 32, 36. Regardless, even assuming, *arguendo*, that Rule 615 required the court to exclude all witnesses upon request unless the witness fell into the one of four categories of people exempted from the rule, we find Sgt. Rizzo was exempted from the rule.

¶ 91    Rule 615 states:

> "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is

33

shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by law to be present." Ill. R. Evid. 615 (eff. Jan. 1, 2011).

¶ 92    In drafting the Rules of Evidence, the Committee noted that it "incorporated into the Illinois Rules of Evidence the current law of evidence in Illinois whenever the Illinois Supreme Court or the Illinois Appellate Court had clearly spoken on a principle of evidentiary law within the last 50 or so years." Ill. R. Evid. Committee Commentary, cmt. 1 (adopted Jan. 1, 2011). It was "well settled under Illinois law [in the 50 years prior to the Evidence Rules enactment] that a testifying police officer may be present at trial during other witnesses' testimony and sit at the prosecutor's table with counsel" absent a showing a prejudice. *Chatman*, 2022 IL App (4th) 210716, ¶ 69 (collecting cases), *aff'd on other grounds*, 2024 IL 129133; see *People v. Miller*, 26 Ill. 2d 305, 307 (1962). The Illinois Supreme Court based this holding on the fact that the officer was a material witness that would assist the State. *Miller*, 26 Ill. 2d at 307; *People v. Leemon*, 66 Ill. 2d 170, 173-74 (1977).

¶ 93    The Committee also stated: "Where there was no conflict with statutes or recent Illinois Supreme Court or Illinois Appellate Court decisions, and where it was determined to be beneficial and uniformly or almost uniformly accepted elsewhere, the Committee incorporated into the Illinois Rules of Evidence uncontroversial developments with respect to the law of evidence as reflected in the Federal Rules of Evidence ***." Ill. R. Evid. Committee Commentary, cmt. 1 (adopted Jan. 1, 2011). Because Illinois Rule of Evidence 615 was modeled after Federal Rule of Evidence 615, we may look to the federal rule as guidance. See *Chatman*, 2024 IL 129133, ¶ 37.

¶ 94    Both the Illinois and Federal Rule 615 include the general exclusion of witnesses upon a party's request or the court's own motion and four categories of witnesses exempt from the exclusion rule. Compare Ill. R. Evid. 615 (eff. Jan. 1, 2011) with Fed. R. Evid. 615 (eff. Dec. 1,

34

2011). The second and third exemption categories do not allow the exclusions of "an officer or employee of a party which is not a natural person designated as its representative by its attorney" or "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Ill. R. Evid. 615(2)-(3) (eff. Jan. 1, 2011); Fed. R. Evid. 615(a)(2)-(3) (eff. Dec. 1, 2011) (using the language "one officer or employee of a party that is not a natural person if that officer or employee has been designated as the party's representative by its attorney" and "any person whose presence a party shows to be essential to presenting the party's claim or defense"). Federal case law has held the second and third categories apply to investigating officers. *United States v. Adamo*, 882 F.2d 1218, 1234-35 (7th Cir. 1989) (stating investigating agent was exempt from sequestration under both categories); *United States v. Edwards*, 34 F.4th 570, 585 (7th Cir. 2022) (same); *United States v. Green*, 293 F.3d 886, 892 (5th Cir. 2002) (court did not abuse its discretion in allowing three investigators to sit at prosecutor table under second category where each agent was from different law enforcement agency and no agency took part in all aspects of the investigation); *United States v. Lee*, 834 F.3d 145, 161-62 (2d Cir. 2016) (investigating agent was exempt from sequestration under third category); *United States v. Casas*, 356 F.3d 104, 126 (1st Cir. 2004) (same).

¶ 95    Despite defendant's argument, the case law indicates Sgt. Rizzo was arguably exempted from exclusion under Illinois Rule of Evidence 615(3) (eff. Jan. 1, 2011). However, based on numerous Illinois Supreme Court cases and the federal law, the State's request to have the lead investigator at its table to assist clearly falls under the second category of exemptions.

¶ 96    We reject defendant's argument that Sgt. Rizzo's presence at the State's table prejudiced him. He argues Sgt. Rizzo's testimony may have been bolstered or other witnesses may have been intimidated while testifying since Sgt. Rizzo interviewed them as part of his investigation.

35

Defendant presents a broad, speculative argument that is true in any case where the lead investigator sits at the State's table and later testifies. Given the numerous Illinois Supreme Court decisions allowing the lead investigator to sit at the State's table despite testifying at trial and interviewing other witnesses (*Leemon*, 66 Ill. 2d at 173-74; *Miller*, 26 Ill. 2d at 307; *People v. Chennault*, 24 Ill. 2d 185, 187-88 (1962); *People v. Dixon*, 23 Ill. 2d 136, 138 (1961); *People v. Strader*, 23 Ill. 2d 13, 23 (1961); *Townsend*, 11 Ill. 2d at 47), we decline to infer prejudice from Sgt. Rizzo's presence in the courtroom.

¶ 97    We further decline to find prejudice based on defendant's specific allegation that Sgt. Rizzo's presence at the State's table allowed him the opportunity to comment on Leanne's testimony and credibility regarding when defendant came into her room, and thus diminished the impeachment value of his own police report. While the timeline of this case is important, defendant fails to explain the significance of the jury believing defendant went into Leanne's room at 2:32 a.m. rather than 3:23 a.m. Regardless of whether defendant entered Leanne's room at 2:32 a.m. as Leanne testified or 3:23 a.m. as Sgt. Rizzo's report stated, the fact remains that defendant came into Leanne's bedroom while holding a television and informed her that Precious had been shot, before or right as Zhanae discovered Precious's body and informed police.

¶ 98    Sgt. Rizzo's presence fell within an exemption under Rule 615 and his presence did not prejudice defendant. The trial court therefore did not err in allowing Sgt. Rizzo to remain at the table. Where there is no error, there is no plain error and counsel cannot be ineffective for failing to raise the issue. *People v. Cooper*, 2024 IL App (2d) 220158, ¶ 103 (citing *People v. Johnson*, 218 Ill. 2d 125, 139 (2005)).

¶ 99                          D. Closing Arguments

¶ 100   Finally, defendant asserts four errors in the State's rebuttal closing argument. He contends

the State improperly (1) inferred defendant could not impeach the witnesses' testimony because

the State gave the defense the witnesses' interrogation videos and the defense did not impeach the

witnesses, (2) invoked the jury's sympathy with respect to Precious; (3) referred to Charita's grand

jury testimony to bolster his credibility, and (4) guessed at what Jerlynn would have testified if the

State had subpoenaed her.

¶ 101            1. Preservation of the Alleged Errors During Closing Arguments

¶ 102   Defendant acknowledges that counsel did not object to all of the errors or include all of the

errors in his motion for a new trial. He, however, requests this court to consider any unpreserved

error under the doctrine of plain error.

¶ 103   As stated above, to preserve an error for review, the party must object at trial and present

the issue in a posttrial motion. *Nelson*, 235 Ill. 2d at 436. Here, counsel either failed to object

and/or assert the issue in the motion for a new trial for three of the complained-of comments.

Counsel did not object to the State's assertion that it gave defense counsel every video-taped

interview of the witnesses, as required. As such, that issue is forfeited.

¶ 104   Counsel objected to the comments concerning the unknown testimony of Jerlynn and

reference to Charita's consistent statements, but such objections were not re-asserted in the

posttrial motion. The motion for a new trial asserted the State—during its rebuttal—improperly

shifted the burden of proof during its rebuttal, referred to defendant's arguments as "red herrings,"

and evoked sympathy of the jury by referring to Precious as a nice or kind person. The motion

failed to explain what comments the first and second allegations regarded. During closing

arguments, the State made two comments that included the term "red herring," but defendant did

not object to these comments. The only objection that included a reference regarding who had the burden of proof was asserted by counsel in response to the State's comment that defendant had an investigator and could talk with anyone he wanted to find. Accordingly, while counsel objected to comments concerning the unknown testimony of Jerlynn and reference to Charita's consistent statements, the failure to assert these issues in the motion for a new trial resulted in forfeiture.

¶ 105   With respect to the State's comments about Precious, defense counsel asserted that the State improperly tried to evoke sympathy of the jury during its rebuttal by referring to Precious as a nice or kind person. However, such remarks were stated in the State's initial closing argument when counsel did not object. Counsel only objected, during the State's rebuttal, to the comment that "there needs to be justice for Precious." As such, we find only a challenge to the comment is properly preserved.

¶ 106          2. Merits of the Alleged Errors During Closing Arguments

¶ 107   Normally, a court will only excuse forfeiture of errors concerning comments made at trial where the comments are " 'so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process.' " *People v. Sims*, 192 Ill. 2d 592, 637 (2000) (quoting *People v. Kokoraleis*, 132 Ill. 2d 235, 283-84 (1989)); *People v. Kuntu*, 196 Ill. 2d 105, 129 (2001). "Absent reversible error, there can be no plain error." *People v. Johnson*, 208 Ill. 2d 53, 64 (2003); see also *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 53. " '[T]o determine whether a purported error is "plain" requires a substantive look at it. But if, in the end, the error is found not to rise to the level of a plain error as contemplated by Rule 615(a), the procedural default must be honored.' " *Johnson*, 208 Ill. 2d at 64 (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)).

¶ 108   Every criminal defendant is entitled to a fair trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 2, 8; *People v. Wheeler*, 226 Ill. 2d 92, 121-23 (2007). The Illinois Supreme Court has repeatedly expressed its " 'intolerance of pervasive prosecutorial misconduct that deliberately undermines the process by which we determine a defendant's guilt or innocence.' " *Wheeler*, 226 Ill. 2d at 122 (quoting *Johnson*, 208 Ill. 2d at 66-67). A prosecutor's duty of fairness to a defendant extends throughout trial and includes closing arguments. *People v. Derr*, 316 Ill. App. 3d 272, 275 (2000).

¶ 109   Prosecutors are permitted wide latitude in closing argument. *Wheeler*, 226 Ill. 2d at 123. They may comment upon the evidence and any reasonable inference thereof, even if unfavorable to defendant. *People v. Rush*, 294 Ill. App. 3d 334, 340-41 (1998). In reviewing allegations of prosecutorial misconduct in closing arguments, we must examine the State's and defendant's closing arguments in their entirety and consider complaints related to the comments in their proper context. *Id.* at 340.

¶ 110   Improper remarks warrant a new trial if they constitute a material factor in defendant's conviction. *Wheeler*, 226 Ill. 2d at 123. If we determine the remarks were not a material factor in the outcome of the trial, "defendant cannot meet his burden of demonstrating a reasonable probability of a different result." *Holmon*, 2019 IL App (5th) 160207, ¶ 53. "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Wheeler*, 226 Ill. 2d at 123.

¶ 111   Defendant first complains that the State said,

> "[Chris Carroll] cooperated with the police, he gave a statement, you saw part of it.
>
> And he testified, and since he testified[,] we didn't show you the video. But that

39

video was given to Mr. Griffin which we're required to [do]. In fact, every video

we had of a witness had to be given to Mr. Griffin. Why? That's just the way it is."

He argues that not only does the statement imply that Chris's statement to police was consistent with his testimony, it implies that every witness's prior statements to police were consistent with their testimonies, because otherwise the defense would have presented the prior inconsistent statements to the jury. He explains critically here, neither Chris's interview nor any other witnesses' police interviews, aside from Charita's, were admitted into evidence and it was complete speculation to assume that their testimony was consistent with their prior statements. We disagree.

¶ 112 The State made no mention of prior consistent statements or compared the witnesses' statements in their respective videos to the testimonies provided at trial. Moreover, the statements in closing argument should be viewed in context of the entire closing argument (*Rush*, 294 Ill. App. 3d at 340), and the State was entitled to respond to defense counsel's arguments. *People v. Figueroa*, 381 Ill. App. 3d 828, 849 (2008); *People v. Kliner*, 185 Ill. 2d 81, 154 (1998). Here, during closing argument, defense counsel highlighted that it did not have detectives or crime laboratories or crime scene technicians or the same talent as the State's prosecuting attorney. Counsel also asserted he discovered another person, besides Charita, who stated there were two shots because he "accidentally" had that on video. Two sentences after the State commented that it provided the defense with every video of the witnesses as required, it further explained "we gave them everything that we had so they could be prepared." Thus, while defendant's argument may have some merit viewing the comment in isolation, the merit is lost when viewing the statement in context with all of the closing arguments, and it is clear the State's comment was a direct

40

response to counsel's assertion that it did not have the same resources as the State and the evidence he discovered was accidental.

¶ 113 Defendant next alleges error in the State saying, "[Precious] took care of people, she was a good person. Was she an addict? Yes, she was. But was she a good person? Yes." And "Ladies and gentlemen, there needs to be justice for Precious, this was her life too." Defendant contends the only purpose for the prosecutor's remarks that Precious was a "good person" was to elicit an emotional response of sympathy for Precious and anger toward defendant. We again disagree.

¶ 114 The State can make all reasonable inferences based on the evidence presented at trial. *Rush*, 294 Ill. App. 3d at 340. Evidence at trial showed that Precious did good things. Viewed in the context of the entire closing arguments, the State's comment about Precious being a good person was to show why she allowed defendant in her home and let him use her bathroom. Also, the State's comment that this was "Precious's life too" was a rebuttal to defense counsel's statement emphasizing "This is [defendant's] life we are talking about." With regard to stating the need to provide Precious justice, we note that "[i]t is entirely proper for the prosecutor to dwell upon the evil results of crime and to urge the fearless administration of the law." *People v. Harris*, 129 Ill. 2d 123, 159 (1989). As such, we find the statement "there needs to be justice for Precious" was to urge the fearless administration of the law to the jury and therefore was proper. See *People v. Smith*, 199 Ill. App. 3d 839, 855 (1990).

¶ 115 However, we agree with defendant's last two claims of error. The State improperly theorized about the possible testimony of Jerlynn Gray. While the State argues defense counsel invited the response by asking why Jerlynn had not testified, the invited response doctrine only applies where the prosecutor is responding to improper argument on the part of the defense counsel. *People v. Anderson*, 407 Ill. App. 3d 662, 678 (2011). The State could have properly

41

limited its reply with its statements, "What's Mr. Griffin think[ing], that I can just command people to be here? I got to find them. I got to subpoena them. *** But when you have a witness who is hiding and ducking, you can't get them here." Instead, it took a step farther and speculated as to what Gray's testimony would have been by saying, "I anticipate Jerlynn Gray would have said, yeah, I was there, I visited for a while and I left." Because there was no evidence of Jerlynn's testimony, this was improper. See *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 33 ("It is improper for a prosecutor to misstate the evidence or argue facts not in evidence."). The State also improperly stated that it "neglected to tell [the jury] [Charita] also testified under oath in front of a grand jury. Consistent statements all along." These statements not only improperly bolstered Charita's credibility but relied on grand jury testimony that was not admitted into evidence. See *id.* (it is improper for prosecutor to argue facts not in evidence and bolster its witnesses' credibility).

¶ 116 Nevertheless, a court's instruction that closing arguments are not evidence cures any resulting prejudice from the improper remarks issued by the prosecution. *People v. Howard*, 209 Ill. App. 3d 159, 182 (1991). While both of the State's comments relied on facts not in evidence, the court sustained counsel's objection to both statements and explained to the jury why it should disregard each statement. Accordingly, any prejudice was cured by the court's remarks.

¶ 117 Defendant also argues the cumulative effect of the instances of misconduct requires reversal. *People v. Abadia*, 328 Ill. App. 3d 669, 684 (2001) ("a reviewing court may consider [the prosecution's errors'] cumulative impact rather than assessing them in isolation" (internal quotation marks omitted)). He contends the prejudicial effect of the prosecutor's conduct was exacerbated by the fact that defense counsel could not address the improper comments made during rebuttal. *People v. Green*, 209 Ill. App. 3d 233, 245 (1991) (prejudicial effect of prosecution's

improper comments compounded by fact they were made during rebuttal, depriving defense of opportunity to address them).

¶ 118   However, as stated above, the only errors were the State's comments regarding the unknown testimony of Jerlynn and that Charita consistently testified with her grand jury testimony. After both instances, the court's curative instruction alleviated any prejudicial effect. *Howard*, 209 Ill. App. 3d at 182. Therefore, the cumulative effect of the State's errors in closing arguments did not constitute reversible error. As noted above, "[a]bsent reversible error, there can be no plain error." *Johnson*, 208 Ill. 2d at 64; see *Holmon*, 2019 IL App (5th) 160207, ¶ 53. Moreover, because the prejudice of the State's improper comments did not deprive defendant of a fair trial, his ineffective assistance of counsel claim also fails. See *Johnson*, 218 Ill. 2d at 143-44.

¶ 119                               III. CONCLUSION

¶ 120   For the foregoing reasons, we find the State sufficiently proved defendant guilty of first degree murder beyond a reasonable doubt, the court sufficiently inquired into defense counsel's potential conflict of interest, the court did not err in allowing Sgt. Rizzo to sit at the State's counsel table during trial, and the State did not commit reversible error during closing arguments. Accordingly, we affirm the trial court's judgment.

¶ 121   Affirmed.